IN RE ESTATE OF JOHN O'CONNOR.
JOHN T. CULAVIN, APPELLANT, v. JAMES B. O'CONNOR
ET AL., APPELLEES.

FILED OCTOBER 2, 1917. No. 19422.

1. **Wills**: CONTEST: EXPERT EVIDENCE: QUESTIONS FOR JURY. In the contest of a will on the ground of forgery, the value of expert testimony on handwriting depends in a great measure on the reasons for the opinion expressed; and the weight of such testimony and the credibility of the witnesses are questions for the jury, where there is a substantial conflict in the evidence on the contested issue.

2. ———: ———: FORGERY: SUFFICIENCY OF EVIDENCE. In a proceeding to probate a will, contested on the ground of forgery, a finding by the jury in favor of contestants on that issue *held* to be supported by sufficient evidence, as outlined in the opinion.

3. **Evidence**: IDENTIFICATION OF SIGNATURE. In the contest of a will on the ground of forgery, the failure of the trial court to permit a witness to identify a disputed signature of a deceased person was not abuse of discretion amounting to error, where the foundation for the rejected testimony was a statement by the witness that 20 years before he had seen a genuine signature of such person, without any showing that the witness had formed an idea of the character of the genuine handwriting.

4. ———: ———. In the contest of a will on the ground of forgery, the opinion of a nonexpert witness on the genuineness of a disputed signature may be rejected, if based alone on a comparison of the disputed and genuine documents in evidence, the jury in that respect being as competent as the witness.

5. ———: EVIDENCE AT FORMER TRIAL:. ADMISSIBILITY. "Where a witness is shown to be absent from the state, his testimony given at a former trial of the same cause between the same parties is admissible if otherwise unobjectionable." *Jerich v. Union P. R. Co.*, 97 Neb. 767.

6. ———: ———: ———. Where the circumstances justify the reading of the testimony of an absent witness, all of his testimony on a former trial may be read, if otherwise admissible, though his cross-examination might have been waived had he been present at the second trial.

7. Wills: CONTEST: PROOF OF SIGNATURES: REBUTTAL EVIDENCE. In a proceeding to probate a will, contested on the ground of forgery, where the subscribing witnesses are dead, proof of the signatures of the subscribing witnesses and of testator is necessary, and proponent should introduce his evidence as to the genuineness of such signatures, and the trial court in its discretion may refuse to permit him, on rebuttal, to offer additional affirmative evidence on that issue.

APPEAL from the district court for Adams county : HARRY S. DUNGAN, JUDGE. *Affirmed.*

*Duncan M. Vinsonhaler,* for appellant.

*F. P. Olmstead, James E. Addie* and *McCreary & Danly, contra.*

*Willis E. Reed, Attorney General, Dexter T. Barrett* and *Sutton, McKenzie, Cox & Harris, amici curiæ.*

ROSE, J.

This is a proceeding commenced in the county court of Adams county May 12, 1914, to probate an instrument described as the last will of John O'Connor, who died in Hastings, August 17, 1913. John T. Culavin is proponent and in the document offered by him for probate he is named as sole beneficiary. Contestants claim to be heirs of O'Connor and assail the purported will as a forgery. The county court sustained the instrument as genuine, but on

appeal to the district court a jury rejected it.    From a judgment on the verdict in favor of contestants, proponent has appealed.

The principal question for review is the sufficiency of the evidence to sustain the verdict, which contains in effect a finding that the instrument offered for probate is a forgery. Throughout the record the purported will is described as "Exhibit A." J. H. Culavin and J. K. Scott, who appear on the face of the disputed writing as subscribing witnesses, are dead. Their signatures were identified at the trial by witnesses who testified to having seen them write their names, but on the issue as to handwriting proponent's witnesses were contradicted by witnesses for contestants. Proponent testified in substance: Exhibit A was executed in the office of the Northwestern Hotel in Hawarden, Iowa, February 25, 1887. It was written by O'Connor himself, who used a modified copy prepared by proponent under O'Connor's direction, the modified copy having been prepared from a draft made the previous day by J. A. Ashley, a real estate agent, who was consulted by O'Connor. Exhibit A was delivered to proponent by O'Connor April 1, 1887, and was afterward kept in the former's possession. This is the testimony of proponent, and he explains the delay in offering the instrument for probate by saying that after O'Connor's death he could not find the will until April, 1914, but then found it folded in a paid-up insurance policy. There is testimony tending to corroborate proponent's story of the execution of the will and of his possession thereof during O'Connor's lifetime. Other testimony of proponent tended to prove that he was a nephew of O'Connor; that the latter moved to Hastings in 1876; that he died there August 17, 1913; and that he had visited Hawarden February 25, 1887. On behalf of contestants there is testimony tending to prove that the O'Connor who died in Hastings, August 17, 1913, was not in Hawarden February 25, 1887, and in other respects casting suspicion on testimony of proponent.

The sufficiency of the evidence to sustain the verdict, however, does not depend alone on proofs of the character

indicated. Other proofs in the form of documents and expert testimony are more satisfactory. The disputed writing was introduced in evidence and speaks for itself in comparison with checks and letters covering a period of years beginning prior to the date of the purported will. These checks and letters are conceded to be genuine. For purposes of comparison exhibit A, the disputed instrument offered for probate, exhibit DD, a genuine letter written by O'Connor to proponent ten months before the purported will is alleged to have been executed, and exhibit CC, a genuine letter written by O'Connor nine years after the alleged execution of the disputed instrument, are reproduced herein.

## EXHIBIT A.

In re Estate of O'Connor.

## EXHIBIT DD.

## EXHIBIT CC.

Identifying characteristics and habits revealed by the letters reproduced are traceable in many other genuine documents introduced in evidence. Witnesses for contestants agree with proponent that whoever subscribed the name "John O'Connor" to Exhibit A, wrote the instrument itself, including the attestation clause. On the face of the disputed and the genuine writings, differences in the handwriting are obvious. Many of the earmarks which characterize O'Connor's handwriting as disclosed by the genuine documents cannot be found in the alleged will. The genuine writings disclose a uniformity of style at variance with the instrument offered for probate. If O'Connor wrote that instrument, in penning it he overcame habits which previously and subsequently controlled him in writing checks and letters, and he also concealed earmarks which are obvious in his other writings. Habits formed by O'Connor in using a pen or pencil are revealed in all of the genuine instruments, but they do not appear to have influenced the writer of the disputed will.

Two expert witnesses called by contestants expressed the opinion that O'Connor did not write the disputed instrument, and they gave reasons for their conclusion. Some of the reasons for the opinion that the offered will is a forgery follow: In handwriting there is a difference in the general appearance of the disputed and the genuine writings. There is also a variance in the slant of the letters and in the spacing. In the capital letter "I" the lower loop is below the base line in the genuine and above it in the disputed writings. In the genuine, the small letter "a," when not the first letter in a word, is not joined to the preceding letter, while it is otherwise in the disputed writing. In the genuine, the cross-mark of the "t" generally appears to the right of the stem, while it generally crosses the stem in the purported will. The two parts of the letter "k" are generally separated in the genuine documents and connected in the disputed will. In the genuine, the apostrophe in the name "O'Connor" is generally made with an upward movement, and with a downward movement in the disputed will. The difference in the letter "x" is marked. There are also other indications of forgery.

The qualifications of the expert witnesses called by contestants are challenged, but they both show candor and scientific knowledge. The experts did not confine themselves to mere opinion, but supported their conclusion by reasons which appeal to the judgment. Such testimony on the subject of handwriting, when considered with genuine and disputed writings, may amount almost to a demonstration. *Venuto v. Lizzo,* 132 N. Y. Supp. 1066. The testimony in the present case recalls the following observations:

"Handwriting is an art, concerning which correctness of opinion is susceptible of demonstration, and I am fully convinced that the value of the opinion of every handwriting expert as evidence must depend upon the clearness with which the expert demonstrates its correctness. That demonstration will naturally consist in the indication of similar characteristics, or lack of similar characteristics, between the disputed writing and the standards, and the value of the expert's conclusion will largely depend upon the number of those characteristics which appear or are wanting. The appearance or lack of one characteristic may be accounted to coincidence or accident, but, as the number increases, the probability of coincidence or accident will disappear, until conviction will become irresistible." *Gordon's Case,* 50 N. J. Eq. 397, 422.

To refute the proofs and inferences of forgery, proponent points to the apparent age of the purported will—a fact conceded by a witness who testified as an expert on behalf of contestants. In this connection it is argued that there was no motive for forging a will February 25, 1887. The argument is not convincing. There is testimony tending to prove that O'Connor had recently abandoned a life of adventure among Indians; that as a cobbler he settled among strangers at Hastings and there led a quiet life for a quarter of a century; that at some time by some means he had accumulated considerable property. His life may have been in peril. With its secrets proponent was familiar. Under the circumstances the jury were not required to find that the apparent age of the document and the lack of motive disproved forgery.

In the argument counsel attached importance to the fact that "Culavin," the name of proponent, is misspelled in the alleged will. He argues that proponent would have spelled his own name correctly in forging a will for his own benefit. The argument is not conclusive. Open minds of jurors should reason from all of the sources of legitimate inference in connection with the misspelled name. Motives prompting a forgery may also suggest a means of avoiding suspicion. O'Connor knew how to spell proponent's name. He wrote it correctly in the genuine letter marked "Exhibit DD." This was ten months before the date of the purported will. He had not forgotten how to spell "Culavin" nine years later when the genuine letter marked "Exhibit CC" was written. According to proponent's testimony, O'Connor in drawing the will followed a copy prepared by proponent himself. In examining the will offered for probate, it will be observed that proponent's name is twice misspelled therein, but that halting and erasing attended its misspelling the second time. On an envelope postmarked two months after O'Connor's death, the name "Culavin" is written "Culivan," but in committing this error the writer evidently wrote the last syllable correctly and afterward changed the "i" to "a"—what seems to have been done in the writing of the purported will offered for probate. In an instrument dated August 1, 1913, and purporting to be O'Connor's will, "Culavin," beneficiary, is also misspelled. It is likewise misspelled in a letter of the same date, denounced by experts as a forgery, the letter containing the statement that O'Connor had made a will naming Culavin as beneficiary. The erasure in the misspelling of the name and the misspelling itself may have had a sinister import when considered by the jury. There is a reasonable aspect, therefore, in which the misspelling does not strengthen proponent's case.

The credibility of the witnesses whose testimony is conflicting in regard to the genuineness of the will offered for probate and the weight to be given to the testimony of those called as experts in handwriting were questions

for the jury.     *Davis v. Lambert,* 69 Neb. 242; *Hayden v. Frederickson,* 59 Neb. 141.

The conclusion is that the evidence is sufficient to sustain the finding of the jury that the instrument offered for probate is not the last will of the John O'Connor who died in Hastings, August 17, 1913.

A ruling of the trial court in refusing to permit a witness for proponent to testify to the genuineness of the signature of Scott is challenged as erroneous. Though the witness testified to having seen the signature of Scott, the ruling assailed must be sustained for the following reasons: The witness had seen Scott's signature only twice, and this was 20 years or more before the trial. He did not testify that he had formed an idea of the character of Scott's handwriting. There was, therefore, no abuse of discretion on the part of the trial court—an essential element of error. 1 Wigmore, Evidence, sec. 694.

Another assignment of a similar nature is directed to the rejection of offered proof by another witness who was not permitted to testify to Scott's signature. This witness did not qualify as an expert in handwriting, but he was asked to express an opinion on the genuineness of Scott's signature, basing his answer on a comparison with two signatures which he had seen Scott write. These signatures were in evidence. In making the comparison the witness, not being an expert on handwriting, was no better qualified than the jury to express an opinion based on comparison of signatures. The law has been stated thus: "Where specimens are brought into court, there is no need of any opinion based on them except from persons skilled in handwriting; for the jury can judge as well as any other laymen." 3 Wigmore, Evidence, sec. 1997.

Another point argued is based on the reading of the testimony of a witness who, as an expert in handwriting, had testified in the county court. During the trial in the district court the expert was in Chicago, engaged in a hearing requiring his attendance for two weeks. In permitting the reading of this testimony under the circumstances, the trial court did not err. *Jerich v. Union P. R. Co.,* 97 Neb. 767; 2 Wigmore, Evidence, sec. 1404. It is

argued, however, that error was committed in allowing the
cross-examination and the redirect examination of the
expert to be read in evidence over the objection of pro-
ponent, since, had the witness been on the stand, cross-
examination could have been waived. The argument is
technical and the rule invoked by proponent might con-
ceal facts essential to a just decision. The purpose of a
trial is to discover the truth and administer justice. Where
competent testimony on a former trial came legally from
proper sources of information, it should not be rejected
on a second trial of the same case merely because one party
rather than the other made the inquiry which developed
the truth. *Ulrich v. McConaughey,* 63 Neb. 10. The cross-
examination to which objection is made consisted prin-
cipally of questions and answers relating to the compe-
tency of the expert and to the reasons for his opinion that
the will offered for probate was not genuine. Documents
revealing the characteristics or habits from which the ex-
pert reasoned in his cross-examination were properly be-
fore the jury. Information of this nature might have been
brought out on direct examination had the expert been
available during the trial in the district court. The rule
is: "On direct examination, the witness may, and, if re-
quired, must point out his grounds for belief in the iden-
tity of the handwriting, on the principle already consid-
ered (*ante,* sec. 655). Without such a re-enforcement of
testimony the opinions of experts would usually involve
little more than a counting of the numbers on either side."
3 Wigmore, Evidence, sec. 2014.

Complaint is also made of the refusal of the trial court
to permit three witnesses, who had seen O'Connor write,
to testify to the genuineness of his signature as it appears
on the will offered for probate. These witnesses were
called on rebuttal. In a proceeding to probate a will, con-
tested on the ground of forgery, where the subscribing
witnesses are dead, proof of the signatures of the sub-
scribing witnesses and of testator is necessary, and pro-
ponent should introduce his evidence as to the genuineness
of such signatures, and the trial court in its discretion

In re Estate of O'Connor.

may refuse to permit him, on rebuttal, to offer additional affirmative evidence on that issue.

Error in the proceedings has not been shown. The judgment is therefore

AFFIRMED.

HAMER, J., concurring.

The verdict of the jury finds the alleged will to be a forgery. The name John O'Connor appears three times in the instrument. It is written in the body of the instrument, and then it is signed to it. And it is also shown in the attestation clause. An examination of the words "John O'Connor," shows that the same person who wrote the body of the will and the attestation clause also signed the will itself. On the left-hand side of the paper and below the attestation clause I find the words "Jno. Culavin." These words, "Jno. Culavin," are, as I understand it, admitted to be in the writing of John Culavin, whose name appears twice in the body of the will. The "Jno. Culavin" is apparently aimed to be in a different handwriting from the John Culavin contained in the body of the will. I can readily understand that if the John Culavin mentioned in the will wrote the will, and it was a forgery, how he might like to interject some evidence which would clearly corroborate his story that O'Connor himself wrote the will. A comparison of the "J" in the "Jno. Culavin" with the "J" in John Culavin in the body of the instrument, shows that the lower part of the "J" is much lighter and shorter than the same part of the letter in the John Culavin twice written in the body of the will. The upper part of the "J" is larger, perhaps almost twice the length of the upper part of the letter as it appears in the instrument, but there is a sort of similarity in the "J" wherever it is written. The pen comes up as it completes the lower part of the "J" and crosses over the stem of the letter and connects with the other letters to be written afterwards. The "Jno. Culavin" is written together and without taking the pen from the paper until it finishes the letter "l." In the name John Culavin as it appears in the body of the in-

strument, the word "John" is written, then the pen is removed from the paper and a capital C is written "C," but in the "Jno. Culavin" written below the attestation clause the "C" is of the same form as a little letter "c" in the alphabet, and is only very little enlarged. In the instrument the word "Culavin" is written without lifting the pen from the paper, but in the name "Jno. Culavin" written below the attestation clause, the pen is lifted from the paper at the termination of "l" and being in about the middle of the word "Culavin." The remainder of the word, consisting of "avin," is written together and without lifting the pen from the paper. In the word "Culavin," as it appears written three times, the "v" and the "a" or the "i" (as it is spelled van, and also vin) are joined together in much the same way. In the three times the words are written there is the same sort of slope between the "v" and the "i," or, as it is spelled in the body of the instrument, the "v" and the "a." Under the tail of the letter "n" as it is first written in the body of the instrument, there is a little dot. This same little dot is put under the tail of the letter "n" in the same way in each case. Most persons would put the period after the end of the letter, and not under it.

Another peculiarity is that the word "Culavin" is not spelled the same way each time. A man ought to know how to spell his own name. If the proponent wrote it, he probably did know. In the "Jno. Culavin" it is spelled "Culavin." Where it is first written in the body of the instrument it is written "Culivan." Where it is written the second time in the body of the instrument it appears to have been written "Culavin," and then to have been written over the first writing so as to make it "van." Why he should have had so much trouble in writing the name the second time, if he did write it, does not very clearly appear, except that if the proponent himself wrote it, he was evidently trying to mislead somebody and to lead the reader who examined the will to form a conclusion favorable to the genuine character of the instrument. The effort

In re Estate of O'Connor.

made, suggests that the writer knew or believed that some question might be raised as to the good faith of the execution of the instrument, and therefore in the body of the instrument he spelled the name "Culavin" first one way, and then another way, and then corrected it, and subsequently put the word "Culavin" where it could be seen by all who looked at the instrument, and shown to be unlike the word as it appeared to be twice written in the body of the reputed will. The several specimens of the name seem to represent different styles of acting, the latter of which is purposely made to be different from the other two.

The letter "n" is twice written in "Jno. Culavin." It is much the same both times as it appears in the body of the will and also in the attestation clause.

I submit what I have written here as worthy of possible consideration in addition to what seems to me to be a conclusive argument in the body of the majority opinion touching the spurious character of the alleged will. The finding of the jury that a forgery was offered for probate seems to be fully sustained by the great weight of evidence.

DEAN, J., dissenting.

The learned trial court denied the offer of proponent to submit to the jury the testimony of the county treasurer and of the deputy county treasurer of Adams county and the cashier of a Hastings bank to establish that the offered signature and handwriting of John O'Connor were genuine. These men were long time residents of the vicinity and acquaintances of the decedent. They were not permitted to testify solely because proponent did not call them as witnesses in chief, as shown in the main opinion. The ruling is without the doubtful merit of being even technically correct. To exclude material testimony on a point so vital for the reasons advanced for excluding it appears to be an abuse of judicial discretion. *Seebrock v. Fedawa,* 30 Neb. 424, 431; *Kerr v. Lunsford,* 31 W. Va. 659.

The expert testimony on handwriting is not satisfactory. The expert conclusion is based on a comparison of the will with letters and bank checks admittedly genuine.

When the testimony is analyzed, the comparison does not seem to be altogether fair upon examination of the exhibits used for comparison. Ordinarily a bank check is hastily drawn for a temporary purpose, perhaps while standing at a bank counter, and with an indifferent pen, or maybe a pencil. To some extent the same is true of a letter. But vastly different is the laborious penning of a will by the hand of a testator. For a man who had lived the life of John O'Connor up to the time the will was written, for one of his temperament and lineage, the making of a will would be a matter of great and dignified import, an event extraordinary, one that would attain almost to the solemnity of a religious rite. It would hardly be expected that he would write a bank check for a nominal or for any amount, or an ordinary letter, with the same care and precision that he would with his own hand write his will from a copy that was prepared by his direction and that lay before him as he wrote. As between an authentic will so written and a collection of bank checks and a few letters as those instruments are ordinarily written, one would expect to find a variance in the slant of some of the letters and in some of the spacing. One would expect to find the cross-mark of almost every "t" crossing the stem in any will that John O'Connor ever wrote, and the lower loop of the capital letter "I" would be planted squarely on the base line. The expert testimony seems to prove too much. In a forgery so much fault is not ordinarily found either with slant or spacing, nor as to the other discrepancies pointed out by the expert testimony.

It would be a different situation if the discrepancies were found in separate collections of checks, or of letters, one collection being admittedly genuine and the other in dispute, and each collection compared with the other. But that is not the case before us. The discrepancies are of the sort that one would expect to find in a comparison between a will that was carefully and solemnly prepared, written and signed by a testator, and checks and letters that were written by him to serve the passing purpose of

a day.  Circumstance of time and place and purpose and condition all have to do with the appearance of the hand-writing.  For the reasons pointed out, and for others equally apparent from a careful reading of the main opinion, the writer submits that the probative value of the expert testimony on handwriting in the present case is reduced to the vanishing point.

It is a splendid sentiment to which the main opinion gives expression and to which all will agree, viz.: "The purpose of a trial is to discover the truth and administer justice." But it is a far cry from a purpose so laudable to the order of proof of the trial court that, for a trivial reason that was scarcely if at all even technically correct, excluded the offer of material testimony that was intended to aid the jury to discover the truth with respect to a vital point, namely: Did John O'Connor, the Hastings recluse, with his own hand, write and sign the will in question?  Every case should be made to hinge, not upon technical rules invoked by the skilled tactician, but rather upon the eternal principles of truth and justice so aptly alluded to in the majority opinion.