IN RE ESTATE OF JOHN O'CONNOR.
CHARLES O'CONNOR ET AL., APPELLEES, v. JOHN SLAKER, ADMINISTRATOR DE BONIS NON, ET AL., APPELLANTS.

FILED SEPTEMBER 27, 1920. No. 21036.

1. **Evidence:** EXPERT ON HANDWRITING. The value of the testimony of a handwriting expert on the issue of forgery depends largely on the cogency of the reasons for his opinion.

2. ———: EXPERT AND OPINION EVIDENCE. The mere opinion of witnesses who testify alone from familiarity with a signature and from comparing genuine and disputed writings has less weight generally on the issue of forgery than expert opinions based on scientific skill and sound reasons.

3. ———: EXPERT ON HANDWRITING. The result of comparisons made by handwriting experts is a character of evidence sanctioned by statute and merits proper consideration on the issue of forgery, in a civil action.

In re Estate of O'Connor.

4. Wills: FORGERY: EVIDENCE. Testimony of handwriting experts that a will offered for probate is a forgery, if based on sound reasons and circumstances supporting that theory, may be sufficient to overturn the testimony of subscribing witnesses that they saw the will executed.

5. ———: ———: ———. On the issue that a will offered for probate is a forgery, the testimony of subscribing witnesses that it was duly executed may be overthrown by any probative proof, either direct or circumstantial, if admissible under the ordinary rules of evidence.

6. ———: ———: ———: PRESUMPTION. After substantial evidence has been adduced in support of the plea that a will offered for probate is a forgery, there is no presumption that the persons purporting to be subscribing witnesses told the truth in testifying that they saw the will executed, though not directly impeached or directly contradicted.

7. ———: ———: ———. After contestants adduce credible proof that the will offered for probate is a forgery, it is error for the triers of fact to entertain the presumption that subscribing witnesses, in testifying that it was duly executed, told the truth merely because they were not directly impeached, but the issue must be determined from all evidential facts considered in their proper light in connection with the plea that the will is genuine and with the charge of forgery.

8. ———: ———: ———. Where circumstances show that subscribing witnesses testified falsely that the will offered for probate had been duly executed, the will may be rejected without direct proof that their reputations for truth and veracity were bad or that such witnesses were corrupt or dishonest.

9. ———: ———: ———. Evidence summarized in the opinion, held to show clearly that the will offered for probate is a forgery.

10. Appeal: REVERSAL. Where the evidence shows that the judgment from which the appeal is taken is clearly wrong on the sole issue of fact, it will be reversed, if properly challenged on that ground.

APPEAL from the district court for Adams county: HARRY S. DUNGAN and WILLIAM C. DORSEY, JUDGES.

*Tibbets, Morey & Fuller, Sutton, McKenzie, Cox & Harris, W. T. Thompson, J. A. Gardiner, McDonough &*

*McDonough* and *Burkett, Wilson, Brown & Wilson*, for appellants.

*F. P. Olmstead, J. W. James* and *J. B. O'Connor*, contra.

Rose, J.

This is a proceeding commenced in the county court of Adams county to probate an instrument alleged by proponents to be the will of John O'Connor, who died in Hastings, Nebraska, August 17, 1913. The county or probate judge received the document by mail September 12, 1917, without any letter of transmittal. Proponents offered it for probate. Parties claiming to be heirs of decedent, but ignored in the will, contested it as a forgery. The county or probate court, the court of exclusive, original jurisdiction, found that the instrument offered was not the will of decedent and refused to probate it as such. Proponents appealed to the district court, where, upon a trial without a jury, the will was sustained as genuine. To reverse the judgment of the district court the contestants have appealed to this court.

The controlling question for determination is the sufficiency of the evidence to sustain the finding that the instrument offered for probate is the will of decedent.

John O'Connor went to Hastings alone more than a third of a century ago and resided there like a recluse until his death. He settled among strangers. He was a cobbler, and pursued his trade and business diligently, lived modestly and left the community at long intervals for brief periods only. In the meantime his estate increased until it exceeded in value $100,000. At the time of his death the neighbors who had known him best and the persons whose business relations with him had extended over a long period of years knew nothing about his early history or his family connections. Since, however, many persons claiming to be his heirs and a number of his purported wills have engaged the atten-

tion of the courts. One of the alleged wills was found to be a forgery. *In re Estate of O'Connor*, 101 Neb. 617. The will in controversy now is in form as follows:

"I, John O'Connor, of Hastings, Adams county, Nebraska, make, publish and declare this my last will and testament, hereby annulling and revoking all other wills and testaments made by me.

"First. It is my will that all my just debts including expenses of my last illness and funeral expenses be paid.

"Second. It is my will that a suitable monument mark my last resting place and that my brother or his heirs, if located, take charge of and bury my remains.

"Third. Having all my life remained single and unmarried and having at this date no wife or children to inherit my property and having no relatives now living unless my brother Charles or his heirs survive me, I hereby dispose of my property and effects as follows, to wit:

"Fourth. I will, bequeath and devise all my property, be it real, personal or mixed and where ever situate, if he be living, to my said brother Charles and if he be dead, I will, bequeath and devise all my said property to his heirs.

"Fifth. Should my said relatives fail to claim under this will within five years after my death, then and in that event, it is my will that all my property, be it real, personal or mixed and where ever situate go and be used for the purpose of founding an orphanage for homeless children of the state of Nebraska, not including the cities of Lincoln and Omaha.

"One of the provisions herein being that no child shall be and remain an inmate of said orphanage longer than ten years, or after said child has reached its tenth birthday.

"A second provision is that all sums of money spent or used in founding or maintaining such orphanage be under the management and control of three directors or trustees, one of whom shall be my executor hereinafter

named or his successor, which said successor shall be named or appointed from Adams county, Nebraska, by the then acting governor of the state of Nebraska. The other two trustees shall be named from Adams county, Nebraska, aforesaid by the then acting mayor of Hastings, Nebraska, and the then acting judge of the circuit court of Adams county, Nebraska.

"A third provision is that said orphanage and all property incident thereto be located in Adams county, state of Nebraska.

"Should it be ascertained that my estate would be insufficient to maintain said orphanage as hereinbefore provided then I would suggest and it is my will, that the age limit of children in said orphanage be reduced, unless the state of Nebraska would make up the deficiency.

"Sixth. I hereby appoint my trusted friend, Mr. W. H. Lanning of Hastings, Nebraska, executor of this, my last will and testament.

"Seventh. It is my will that my said executor and any trustees that may be appointed hereunder be required to give bond for the faithful performance of this trust.

"Executed by me this 10th day of October, 1908.

"John O'Connor

"Signed, sealed, published and declared by the above named John O'Connor, as and for his last will and testament, who in the presence of us and at his request, and in the presence of each other, have subscribed our names hereto as witnesses hereof.

"Lawson Tarwater.
"Stephen H. Turner.

"State of Missouri  }
County of Buchanan }  ss.

"On this 10th day of October, 1908, before me, the undersigned, a notary public within and for Buchanan county, state of Missouri, personally appeared John O'

Connor of Hastings, Nebraska, who is personally known to me to be the person described in and who executed the foregoing will and testament and subscribed and published same in the presence of the above named witnesses to be his last will and testament.

"In witness whereof, I have hereunto set my hand and affixed my official seal at my office in St. Joseph the date and year first above written. My term expires on the 22d day of March, 1909.

"(Seal)          Grant S. Watkins, Notary Public."

If this is a genuine will, it was drawn by and acknowledged before Grant S. Watkins, an attorney at law and notary public, and was executed in his office on the fourth floor of the German-American Bank Building, St. Joseph, Missouri, October 10, 1908. It is alleged that the Charles O'Connor mentioned in the will as the brother of decedent died June 13, 1903, and that proponents, eleven in number, are his sons and daughters. Watkins died August 5, 1909. His widow, a witness for proponents, told the story of the finding of the will, which may be summarized thus:

September 11, 1917, James D. Witten, of Kansas City, Missouri, who, long ago, had shared a law office with Watkins, and who had not been seen by Mrs. Watkins for a good many years, called on her at her home in St. Joseph, asked her about some mining stock formerly owned by her husband, inquired if she wanted to sell it, and wondered what had become of her husband's law books. She told him the books had all been sold except a set of Lawyers' Reports Annotated and a few volumes of an Encyclopædia. For the purpose of examining the books Mrs. Watkins and Witten went together the same day to the law office of W. K. Amick, where the books, in the bank building mentioned, had been stored after the death of Watkins. They were piled in a corner and were covered with dust. Amick was in his office at the time with his back to the books. After Witten had ex-

amined a number of volumes, a book in his hands opened, while he was seated, and from the position of Mrs. Watkins as she stood behind him she observed between the leaves a sealed envelope, marked on the outside a will. She took it, but did not open it, and without calling Amick's attention to what had been found in his office went directly with Witten to an office in another building. There she procured a suitable mailing envelope. She and Witten then went directly to the post office. By his direction Mrs. Watkins sent the sealed document by registered mail to the "Probate Judge, Hastings, Neb." A few minutes later Witten left St. Joseph for Kansas City. After some negotiating and a trip by Mrs. Watkins to Kansas City in response to a call by telephone, Witten bought the books for $35, and they were shipped to him in November following.

In substance this is the story of Mrs. Watkins. In many respects it is like the testimony of Witten, who was called as a witness by some of the contestants. He said, however, that he was not seated while examining the books, that Mrs. Watkins found the will, that he never touched it, and that he was never nearer to it than three feet; but he admitted he advised her to send it to the probate judge at Hastings by registered mail without mentioning the matter to any one, and that he did not leave her until he was certain that the registered envelope had been deposited in the post office. Where the testimony of these two witnesses to the finding of the will conflict, that of Mrs. Watkins is more satisfactory. She seems to have a better memory and appears to be more candid. Both testified by deposition.

The registered letter was received by the county or probate judge at Hastings September 12, 1917. When opened it contained a sealed envelope bearing in typewriting the following indorsement:

"My last will and testament. In case of death send to W. H. Lanning, Hastings, Nebr."

This was followed by "John O'Connor, Hastings, Nebr.," written with pen and ink in the genuine or the simulated handwriting of decedent. After publication of notice of a purpose to open the sealed envelope, the county judge publicly opened it November 19, 1917, and it contained the will in controversy.

Mrs. Watkins, in giving her deposition, looked at a photographic copy of the will and said she thought the name of the notary, "Grant S. Watkins," by whom the acknowledgment purports to have been taken, was the genuine signature of her husband.

W. K. Amick testified that, in a drawer in his office desk under papers which had not been disturbed for several years, he found a notarial seal; that, when found, it could not be opened; that he had it repaired and, when tested, it proved to be the seal of Watkins. Impressions of the seal were taken in open court and they are identical with the impression of the seal on the will.

The names of the subscribing witnesses are Lawson Tarwater and Stephen H. Turner. At the time of the trial the former resided in Kansas City, Missouri, and the latter in San Bernardino, California. According to their story as told on the witness-stand, they became friends in 1899, while working in the Burlington shops at St. Joseph, Missouri, their friendship having remained steadfast and a correspondence having been carried on between them when separated. Their testimony on the witnessing of the will, for present purposes, may be summarized as follows:

In October, 1908, Turner, while employed in a dairy at Jacksonville, Illinois, had a two weeks' vacation, with liberty to go where he pleased, and went on a visit to the home of Tarwater, who then resided in St. Joseph, Missouri, arriving at the latter's residence in the forenoon, Saturday, October 10, 1908. In the afternoon of the same day host and guest walked down town, a mile or more, and went together to the law office of Watkins, an

acquaintance of Tarwater, whose purpose in calling was to inquire about the renting of some property. Tarwater and Turner walked into the office of Watkins between 3 and 4 o'clock in the afternoon. Tarwater spoke to Watkins and introduced Turner. Watkins shook hands with both. At the time another man seated in the office was introduced by Watkins to the two arrivals as John O'Connor, of Hastings, Nebraska, and came forward and shook hands with them. "I have a will here for Mr. O'Connor," said Watkins. "We should like for you boys to sign this will, if you haven't any objections." Both expressed a willingness to be witnesses. Watkins read the will, asked O'Connor if it was his will, and was answered in the affirmative. The signatures were written on the will by each person in the following order: O'Connor, Tarwater, Turner, Watkins. The latter took the acknowledgment and affixed his notarial seal. Tarwater talked to Watkins about renting a house, while Turner engaged O'Connor in conversation. The subscribing witnesses were in the office of Watkins 20 or 30 minutes only. They had never before seen John O'Connor and never saw him afterward.

If the subscribing witnesses told the truth, the will offered for probate was executed in the manner outlined. In the respects narrated there was no material difference in the testimony of the two subscribing witnesses. Both were specific, direct and positive in their statements. In addition, the office of Watkins, the pens used by all present, the sealing of the will by Watkins in an envelope, the personal appearance of John O'Connor and of Watkins, the former's benefactions and his statements in regard to himself and to his lost brother, Charles, and the place of their nativity, were described in more or less detail by one or the other or by both of the subscribing witnesses while testifying on behalf of proponents.

There is also proof that John O'Connor once went to St. Joseph to purchase shoes for his store, but the date is not given, and the evidence tends to show it was not October 10, 1908. In addition, there is testimony by both experts and nonexperts that the names of John O'Connor and Grant S. Watkins, as they appear on the will, are genuine.

Was the trial court clearly wrong in finding that the will offered by proponents for probate was genuine?

Wallace O. Shane, paying teller of the Omaha National Bank, with which he had been connected in some capacity for nearly 35 years, testified on behalf of contestants as a handwriting expert. He had examined the handwriting of decedent and his genuine signature, including checks, letters and other instruments, his purported signature on the will, and had compared accepted standards with the disputed writing and expressed the opinion that the latter was a forgery. Asked to give reasons for his opinion, the expert explained characteristic habits of decedent in writing his name as shown by genuine signatures covering a number of years. The following is a facsimile of a genuine signature:

A reproduction of the disputed signature on the will follows:

Some of the habits, characteristics, and earmarks of John O'Connor, as revealed by his genuine signatures, but not found in his purported signature on the will,

were pointed out by the expert, Shane, in substance, as follows: The strokes of the pen show a tremor. The letters "J" and "h" and "C" are about in a line. The upper loop of the "J" is wide at the top and is above the base line, the left curve being nearly uniform to the apex. The "o" in "John" has a pinched appearance, and the line running therefrom to the top of the letter "h" is almost vertical, the stem of the "h" being finished and left with sharp strokes. The latter part of the "h" and the "n" show a cramped position of the hand. The bottom of the capital letter "O" extends below the base line. The right side of the loop in the capital letter "C" is almost vertical, and it is crossed by the left curve close to the base line. The small "o" following "C" in the word "O'Connor" is almost vertical, and the two "n"'s are made with sharp strokes. The last "o" in the name shows stops of the pen or a tremor, and between it and the final "r" the line is almost straight.

The expert explains that these peculiarities in the genuine signature result from the habits of John O'Connor in writing his name, and are not evidenced by the disputed signature. In handwriting "a habit," says the witness, "operates automatically without a man's conscious effort." The imitator or the forger is not affected by these habits or by the natural tremor of an older person. As interpreted by the expert, they tell their own story of the handwriting of John O'Connor in connection with the standards used. In the respects outlined, when explained by the expert, there are distinctive chirographic differences between the genuine and the disputed signatures, as comparisons show. If John O'Connor signed the will, in doing so he departed from the habits of penmanship which had voluntarily prompted him for years in writing his name. This witness had made a study of standard texts on the subject of handwriting and had testified as an expert in important

cases involving the charge of forgery. His testimony answers for itself and gives its own reasons for the light it throws on the issue of forgery. An eminent author writes:

"The real expert,  *  *  *  when guided and assisted by the competent lawyer, will make the facts themselves testify and stand as silent, but convincing, witnesses pointing the way to truth and justice." Osborn, Questioned Documents, p. XXIII.

Of this author's work, Wigmore says:

"The feature of Mr. Osborn's book which will perhaps mark its most progressive aspect is its insistence upon the reasons for an opinion, not the bare opinion alone." L. R. A. 1918D, 647 (*Baird v. Shaffer*, 101 Kan. 585).

The importance of this feature of expert testimony on handwriting was emphasized in a former opinion. *In re Estate of O'Connor*, 101 Neb. 617.

There is other testimony of a similar import. Charles G. Lane, president of the Exchange National Bank of Hastings, had known John O'Connor for 30 years. The latter had been a regular depositor and customer of that bank and had kept therein a box for papers. Lane had seen him writing his name, was familiar with his handwriting, had recently compared genuine signatures with the signature on the will, and expressed the opinion that the latter was a forgery. His answers on the witness stand show that he was competent to testify from actual knowledge as well as from the standpoint of a handwriting expert. In several important particulars he points out distinctive features of the genuine handwriting which are not found in the disputed signature. In all of the genuine signatures, according to his testimony, the letters are imperfectly formed as compared with those in the disputed signature, and in the latter the terminating curve in the capital "O" is too heavily shaded. From observation of John O'Connor while writing his name, Lane said that the former made the apostrophe in a care-

less manner with a quick upward stroke, always making it the same way, commencing at the bottom and finishing at the top. Lane also testified, in substance, that the apostrophe in the name on the will was made from the top downward, the pen opening with pressure where the line is shaded and closing with a fine point at the end. This testimony shows on its face that it speaks the truth when considered with the genuine and the disputed signatures and with the other evidence. It demonstrates that the apostrophe, which is a distinctive part of the name of John O'Connor as he always wrote it himself, is upside down on the will. Being in the habit of making the apostrophe in a careless manner from the lower end upward, and being thus prompted without a conscious, mental effort, the inference is that he did not write his name on the will with this character wrong end down in a different form. The apostrophe in the name on the will shows, as the expert explains, that it was not carelessly made with an upward stroke, as John O'Connor made it, but that it was carefully made with a downward stroke, the pen spreading with pressure where the shading is heavy and closing where the character terminates with a fine point. Other differences between the genuine and the disputed signature, as the chirography is analyzed by the experts, tell the same story of forgery.

Testimony of this character is sanctioned by legislation. The statute provides:

"Evidence respecting handwriting may be given by comparisons made by experts or by the jury with writing of the same person which is proved to be genuine." Rev. St. 1913, sec. 7912.

Testimony of handwriting experts that a will is a forgery has been held sufficient to overturn oral testimony of subscribing witnesses that the will was duly executed. *Weber v. Strobel*, 194 S. W. (Mo.) 272; *Baird v. Shaffer*, 101 Kan. 585, L. R. A. 1918D, 638. In the latter case the rule announced reads thus:

In re Estate of O'Connor.

"The testimony of subscribing witnesses to a will may be overcome by any probative facts and circumstances admissible under the ordinary rules of evidence."

There is also in the present case expert testimony of a probative nature tending to prove that the name of Grant S. Watkins, the lawyer by whom the will is said to have been drawn and before whom it purports to have been acknowledged, is a forgery.

While witnesses who had seen Watkins writing his name and who were familiar with his handwriting testified to the opinion, after examining accepted standards, that his signature on the will is genuine, the reasons which give weight to such testimony are generally wanting. There is like proof as to the genuineness of the signature of John O'Connor on the will, and one handwriting expert gave reasons for his conclusion, but they failed to show characteristic habits of decedent by which the writer of the signature on the will was prompted. All of such testimony on behalf of proponents, though entitled to consideration, lacks weight for want of cogent reasons, when the expert proof of forgery is considered from the same standpoint. Note III, L. R. A. 1918D, 647.

The two subscribing witnesses who testified on behalf of proponents that the will was duly executed were not directly impeached or directly contradicted by other witnesses, and for that reason the trial court, in reaching the conclusion that the will is genuine, indulged the presumption that they told the truth. This presumption, after there had been credible proof of the forgery charged by contestants, was entertained throughout the remainder of the trial below and inheres in the judgment, as shown by the opinion of the trial court. After the evidence of forgery had been adduced the entertaining of such a presumption was a serious error. In a civil case, when there is substantial proof in support of the plea that the will offered for probate is a forgery, all presumptions in favor of genuineness fall. Thereafter the truth must be

found in the evidence itself, and every item of proof must
stand on its own footing in connection with each eviden-
tial fact considered in its proper light. In this test pre-
sumption creates no advantage one way or the other. In
such a situation persons who declare themselves to be
subscribing witnesses and boldly speak from the witness-
stand as such, though not directly impeached, are subject
to the same impartial and penetrating scrutiny as the
mute instrument ascribed by them to the dead. In the
unbiased search for the truth the law has no favorites by
presumption. Silent circumstances, without power to
change their attitude, or to make explanations, or to com-
mit perjury, may speak as truthfully in court as animated
witnesses. When an issue of forgery in a civil case is
raised by pleadings and contested by evidence on both
sides, there is no presumption either in favor of witnesses
or in favor of circumstances. All of the evidential facts
which throw light on the issue must be considered in con-
nection with the allegation of proponents that the will is
genuine and with the charge of contestants that the docu-
ment offered for probate is a forgery. If the truth is
found in oral testimony, it must determine the issue, but
it is equally potent if found in circumstances. In the
recent case of *Baird v. Shaffer*, 101 Kan. 585, the appel-
lants stated their position as follows:

"It is also our contention that the positive testimony
of the three subscribing witnesses cannot be overthrown
by mere opinion evidence in the absence of evidence tend-
ing to show corruption or dishonesty on the part of such
attesting witnesses."

This was answered by the supreme court of Kansas
as follows:

"The testimony of attesting witnesses to a will may be
overcome by any competent evidence. * * * Where
the signature to a will is a forgery, and where the attest-
ing witnesses have the hardihood to commit perjury, it
is difficult to see how the bogus will can be overthrown ex-

cept by expert and competent opinion evidence tending to show that the pretended signature is not that of the testator, but spurious.''

There being competent evidence on both sides of the controverted issue, the circumstances must be considered from the standpoint of forgery as well as from the standpoint of genuineness.

Whether the will is genuine or spurious, the person to be most benefited by it, if probated, is James B. O'Connor, of Kansas City, Missouri. He claims to be a son of Charles O'Connor, testator's lost brother and beneficiary, who died June 13, 1903, leaving eleven children now living, all being proponents. In addition to his share of the estate, if the will is probated, James B. O'Connor is interested as attorney for the other legatees and devisees. October 10, 1908, the date of the will, and both before and after that, he occupied an office on the fourth floor of the German-American Bank Building, St. Joseph, Missouri, diagonally across a corridor from the office of Grant S. Watkins, where the will was found in presence of the latter's widow September 11, 1917; Watkins having died August 5, 1909. Some of the law books and the notarial seal of Watkins were in a law office on this floor until the will was found. James B. O'Connor was familiar with the scenes of the making and of the finding of the will as the facts are pleaded by him. He knew Watkins, who is said to have drawn it, and Tarwater, a subscribing witness who testified it was executed. James B. O'Connor spent at least two hours a day for six days with the other subscribing witness, Turner, in California before the latter gave a deposition in this case, and he also knew Witten, who found the will in time to prevent the estate of decedent from going to a charitable institution. James B. O'Connor, Tarwater, and Witten, all former residents of St. Joseph, and all familiar with the office in which the will was found and the surroundings, now live in Kansas City, Missouri. James B. O'Connor

was a listener at a trial in Hastings, Nebraska, where an instrument purporting to be the will of John O'Connor, deceased, was found to be a forgery, and therefore had an opportunity to observe the handwriting, appearance, property, neighbors, and business associates of decedent. The incentive for the forgery and the knowledge essential to such an undertaking are clearly shown.

From the standpoint of a genuine will the stories of the witnesses who testified that it was executed and found are unusual, if not fanciful. A careful, exacting man, with sufficient sagacity and determination to keep all knowledge of his family connections from his neighbors and business associates for a third of a century and to make and preserve a fortune, is not likely to confide his secrets and the disposition of his property to utter strangers or to chance. From the standpoint of forgery the will and the discovery are clever devices to deceive the court and to screen the forger from justice. The will itself, if examined without suspicion, contains an unnecessary acknowledgment, which a careful lawyer would generally avoid; but, considered as a forgery, the acknowledgment and the seal create an appearance of authenticity to allay suspicion of forgery and to make an occasion for the recital of facts difficult of proof, namely, that testator was John O'Connor, of Hastings, Nebraska, that he was personally known to the notary, and that the will was executed.

The finding of the seal under papers that had not been disturbed for several years, as already stated, is a circumstance tending to indicate that the will is not a recent device adapted to known, present conditions, but it does not necessarily refute the inference of a series of circumstances tending to support the theory of forgery. A single incident like that may be due to an honest mistake of the witness who so testified or to an imposition, just as Mrs. Watkins, who saw the will in the book, may have mistakenly, but honestly, believed it had been left there by her husband years before.

No one would forge a will, intending to have it probated, without plans for its discovery, for the screening of himself from justice, and for procuring the false testimony essential to proof of its execution. Was the will discovered by accident or design? Witten opened the book where it was seen by Mrs. Watkins. Do the circumstances or his testimony indicate that he would not undertake such a mission? He used reckless, coarse and profane language while testifying, and was unable to disguise his anxiety to create the impression that he had not acted by prearrangement or design in his connection with the finding of the will and with his directions to Mrs. Watkins to send it secretly to the probate court. Among other things, he said, in substance, that he was a grandson of a brother of King Albert of England; that he was admitted to the bar in Keokuk, Iowa, in 1866, but never practiced law regularly, because he had been shot in the neck at Long Jack, the wound interfering with his speech, though he had been interested in a law office with Watkins for four years beginning in 1887; that he had run down and arrested moonshiners in Arkansas, Indian Territory, and Missouri; that he had been special agent for the federal revenue department in western Nebraska; that he was with Frank Hickock, known as "Wild Bill," when the latter was murdered in Deadwood; that he had been interested in mines in Arkansas, and had been with "Wild Bill" in the Black Hills during the mining excitement there; that he was investigator at St. Joseph for the street car company and the Grand Island Railroad, James B. O'-Connor having cases against those corporations at the time; that he was not often in that attorney's office in Kansas City, Missouri. His evidence as to the finding of the will is on its face open to the suspicion of design. While he was called by some of the contestants as a witness, the court is more interested in ascertaining the truth than in charging his infirmities to any particular

litigant.   Though he said his errand to the home of Mrs. Watkins was to inquire about mining stock, the conversation promptly drifted by his inquiry to the law books of her deceased husband.   These books absorbed his attention until the will was found, and thereafter the will was the sole subject of interest until it was in the mail, when Witten immediately left Mrs. Watkins for Kansas City.   The negotiations for the books did not close for perhaps two months, and not until the will was about to be, or had been, opened in the county court at Hastings, Nebraska.   He confessed he had made no use of the books.   The sealed envelope, when found, bore this indorsement in typewriting:

"In case of death send to W. H. Lanning, Hastings, Nebr."

Though there were no other directions, Witten instructed Mrs. Watkins to send the will to the "Probate Judge, Hastings, Neb.," instead of following the direction to send it to Lanning, and she did as she was told. The will thus escaped the scrutiny of a public-spirited man of known integrity before reaching the probate court.   The evidential facts, the character of the testimony of Witten, and the circumstances disclosed by all of the evidence are consistent with the charge of forgery and with the theory that the will was found by design, and not by accident.

Do the proofs of forgery and the corroborating circumstances overthrow the testimony of the two subscribing witnesses, Turner and Tarwater? These witnesses seem to have been chums. Their employment changed often and they frequently moved from place to place.   Within a few years Turner had been a helper in a machine shop, an operator in a gas plant, a stationary fireman, a janitor in a building, an employee in a dairy, a laborer in an orange grove, in car shops, and in an ice plant, and had been in the employ of Young Men's Christian Associations in a number of cities in the capacity of janitor or

caretaker of rooms. In the meantime he had lived in seven different states. He took an active interest in the O'Connor estate as early as January 21, 1916, when, in the Young Men's Christian Association, LaFayette, Indiana, he wrote a letter to Tarwater, saying in part:

"I received a little surprise to-day. I picked up a Nebraska State Journal in one of the rooms and glanced over it, and what do you think caught my eye? It was an item about the John O'Connor estate being turned over to the state of Nebraska. I wonder Jack if that could be the John O'Connor that we were witnesses to his will several years ago when I was in St. Joe visiting you? You remember, don't you? It was in that lawyer's office where we went for you to have a lease fixed up. Let me see, what was his name? 'Watkins'—that was it—in that big bank building; but what I was going to say, Jack, it seems to me as though there has been some will come up that has been forged. Now that will we signed Jack is somewhere in existence, or must be, and if it could be found it might be of great value to some of the heirs; but now let me see—didn't that will read, or I mean, turn everything to an only brother? Do you remember his name? It was Charlie, wasn't it? Ha! Ha! I am sure you will remember all about it, and I am pretty sure this is the O'Connor, for the one that made the will was from Hastings. I will send you the paper so you can see for yourself. Well I must close hoping that O'Connor's brother runs across that will some time.

"Good bye.   Write soon.
"Stephen H. Turner."

This letter contains its own evidence of craftiness. Generalities, such as "that big bank building," self-questioning and inquiries in regard to the name of the lawyer, of the testator, and of the devisee, all disappeared when Turner testified to minute details of the building, of the lawyer's office, of the meeting, and of the execution of the will, even describing O'Connor and Watkins and the

pens used by all present, after the lapse of 10 years, though nothing of a striking nature had occurred to make deep and lasting impressions on the mind. If Turner told the truth, he obtained, within 30 minutes, from John O'Connor, an utter stranger, a knowledge of the latter's family history, which had been kept from neighbors and business associates for more than 30 years. Tarwater's story of the execution of the will is like Turner's. The similarity suggests a recent understanding, rather than an honest recollection of what occurred 10 years earlier. They testified too much for disinterested, truthful witnesses. One of the inferences from the testimony of Turner and Tarwater is that the will was sealed in an envelope and left in the hands of Watkins. On the outside of the envelope part of the indorsement already mentioned reads thus:

"In case of death send to W. H. Lanning, Hastings, Nebr."

"John O'Connor, Hastings, Nebr."

The name of John O'Connor as there written purports to be his genuine signature, but it is denounced by experts as a forgery. How could this recluse, in the ordinary course of events, without the public notoriety which he shunned, expect the news of his death at Hastings to reach Watkins at St. Joseph? If the indorsement quoted was the work of a forger who planned to have the envelope discovered and sent to Hastings, bearing its own evidence of having been unopened, the indorsement served an intelligent purpose.

If the story of the subscribing witnesses and the theory of proponents are correct, John O'Connor, in going to the lawyer's office to will his fortune to his lost brother, Charles, if found, otherwise to the heirs, got out of the elevator with his face toward the office of his brother's son, his nephew, James B. O'Connor, whose name was on the door, and to the latter this munificient benefaction remained a profound secret until the will was opened in

Hastings, while Tarwater, the friend of James B. O'Connor, the beneficiary, knew of the will and of its contents during all of the intervening time. The testimony of a former stenographer in the office of James B. O'Connor, while he was practicing law in St. Joseph, tends to prove an intimacy between him and Tarwater that neither of the two was willing to admit. Part of the testimony of the subscribing witnesses is consistent with the charge and the proof of forgery and is not above the inference of perjury. The story of John O'Connor's signature told by the experts who testified on behalf of contestants, when considered in the light of corroborating circumstances, is better evidence of the truth than the testimony of the subscribing witnesses on the controlling issue of fact.

If properly dated, a letter from James B. O'Connor to Mrs. Watkins, who testified that Witten found the will, shows conclusively that the writer of the letter knew the contents of the will before it was opened. This letter is distinctly dated November 4, 1917, fifteen days before the county judge opened the sealed envelope containing the will. When confronted with this letter, the author of it testified that the date was an error and should have been November 24, 1917, five days after the opening of the will. Notwithstanding earnest efforts of the writer of the letter to utter the will alleged to have been forged, the proof of forgery, the grave import of the circumstances tending to connect him with it, and the contradiction of his oral correction by the letter itself over his own signature, he made no attempt to show how the mistake occurred, who made it, or to verify the exact date by memoranda or by records of his correspondence. The letter itself, however, shows that it was corrected both with a typewriter and with a pen, indicating great care in preparing it and a reexamination of it before it was mailed. The letter itself contains a proper inquiry about evidence, if the will is genuine, but shows that there was in the mind of the author of

the letter a suspicion that his motives might be questioned, a suspicion more likely to arise from a knowledge of evil than from a consciousness of virtue. While Mrs. Watkins said she did not receive the letter until after the will had been opened, she was unable to give the date of its receipt by her or to produce the postmark, and may have been mistaken as to the fact. Under the circumstances the letter itself seems to be the better evidence of its date, and it shows that James B. O'Connor, though claiming to be an heir unknown to testator, knew the contents of the will before it had been opened.

The stenographer employed by Watkins in his law office, having served in that capacity continuously for three years up to the time of his death, testified from memory, from recent examinations of some of her work while in his office, and of documents in evidence, and from knowledge of customs, of typewriter, of office stationery, and other supplies, in substance, as follows: Except for a week's vacation in July, she had not been absent from her duties. She did not have a weekly half-holiday, but remained in the office until about 5:30 Saturday afternoons. She had not been absent on account of sickness. While temporarily away from the office her employer generally waited for her services upon her return. She did not know of any work having been done in his office by another stenographer. She had written a few wills for him, but had never heard of the one in question until recently, and had no knowledge or recollection of John O'Connor or of Tarwater or of Turner having been in the office. The will had not been written on the office typewriter, the only one there during her term of service, and the paper, cover and envelope were in size, kind and quality unlike any stationery kept or used by her employer or observed by her in his office. Typewriting showing her work and the paper used in the office were identified or described, disclosing

differences. It was not the custom of Watkins to append an acknowledgment to a will or to require a typewritten indorsement on the outside of the envelope inclosing it. Separate sheets of his legal documents, however, were fastened together at the top with small metallic staples clamped with an appliance adapted to the purpose, and these were exactly like the ones used on the will. Within two months after the death of Watkins his office was occupied by James B. O'Connor. A stenographer who had performed services for him said she knew his signature and that the patronymic part of the signature of John O'Connor on the will looked like the handwriting of James B. O'Connor. A stenographer who was familar with the signature of Watkins, having seen him write it a great many times, expressed the opinion that the one on the will was not his. This testimony throughout bears the stamp of truth.

A banker with whom John O'Connor had transacted business for 25 years and also a neighbor who had known John O'Connor for a third of a century testified to conversations with him in regard to the making of his will. These conversations all occurred within a year and a half of the death of John O'Connor, and what he said, according to these witnesses, indicates that he had not then made his will. This neighbor testified that Judge Tibbets of Hastings had been mentioned by John O'Connor as the attorney selected by him to draw the will.

One witness produced what he verified as a correct, original book entry showing that Saturday, October 3, 1908, a week earlier than the date of the will, he had completed the erection of a windmill on a farm owned by John O'Connor, and a tenant testified that he paid to John O'Connor, in the latter's room in Hastings, rental for pasture, Saturday afternoon, October 10, 1908, the date of the will, fixing the time by incident as the Saturday following the completion of the windmill, a subject of

conversation between them. If this is the truth, John O'Connor was not in St. Joseph the day the will purports to have been executed.

The expert testimony and the circumstances in which the truth on the sole issue of fact is found confirm the charge of forgery and condemn the will as spurious.

The evidence as a whole shows that the will is a forgery, that the judgment of the county court denying the probate is free from error, and that the judgment of the district court sustaining the will is clearly wrong.

Reversed and judgment of county court affirmed.

JUDGMENT ACCORDINGLY.

MORRISSEY, C. J., dissents.

ALDRICH, J., not sitting.