IN RE ESTATE OF JOHN O'CONNOR.
JOHN F. KIRKMAN ET AL., APPELLANTS, V. STATE OF NEBRASKA, APPELLEE.

FILED JANUARY 23, 1926. No. 24075.

1. **Appeal:** TRIAL DE NOVO. An appeal to this court from the district court in a suit in equity is the only one wherein it is the duty of this court to retry the issues of fact upon the evidence preserved in a bill of exceptions, and, on a trial *de novo,* reach independent findings and conclusions.

2. ———: ———: PROCEEDINGS TO DETERMINE HEIRSHIP. A proceeding begun in the county court, to determine whether petitioners are next of kin and heirs at law of a decedent, does not present a case calling for the exercise of equitable jurisdiction, and does not fall within the provisions of section 9150, Comp. St. 1922, requiring a trial of the issue of fact *de novo* in the supreme court.

3. **Trial:** REFUSAL OF INSTRUCTION. Error cannot be predicated upon the refusal to give a proper instruction, when it appears that the substance and effect of the instruction were contained in the court's charge to the jury.

4. **Appeal:** INSTRUCTIONS: HARMLESS ERROR. In a proceeding by a number of persons, claiming to be heirs of an intestate decedent, in which the state intervened, alleging that the decedent died leaving no heirs at law, an instruction which permitted the jury to find that the decedent died without heirs was not prejudicial to a claimant who was found not to be related to the decedent. If claimant was not related to decedent, it was immaterial to him whether or not decedent's property should escheat to the state.

In re Estate of O'Connor.

5. **Evidence** examined and found to support the verdict.
6. **Descent and Distribution:** PROCEEDINGS TO DETERMINE HEIRSHIP: INTERVENTION BY STATE. Where, in the county court in the probate of the estate of an intestate decedent, numerous persons file petitions, alleging that they are related to decedent, and there is reason to believe that the decedent died without heirs, it is proper for the state to intervene in the proceedings, and assert its right and prevent the establishment of a spurious claim as genuine.

APPEAL from the district court for Adams county: LEWIS H. BLACKLEDGE, JUDGE. *Affirmed.*

*McKenzie, Lower & Sheean* and *W. W. Bulman,* for appellants John F. Kirkman et al.

*Tibbets, Dungan & Tibbets* and *Frank E. McGray,* for the Olsen Claimants.

*McDonough & McDonough,* for the Allman claimants.

*Burkett, Wilson, Brown & Wilson* and *James & Danly* for the O'Connor claimants.

*O. S. Spillman, Attorney General,* and *W. T. Thompson,* for the State.

*J. J. Sullivan* and *Epperson, Massie & Epperson, amici curiæ.*

Heard before MORRISSEY, C. J., DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ.

GOOD, J.

This action originated in the county court of Adams county, Nebraska. John O'Connor, a resident of said county, died intestate on the 17th of August, 1913, leaving an estate valued, approximately, at $100,000. Numerous persons appeared and filed petitions, in which they averred that they were next of kin to, and heirs at law of, deceased. The state intervened, denying that any of the claimants were related to or heirs of O'Connor, and praying

that it be adjudged that O'Connor died without heirs, and that his estate escheat to the state of Nebraska.

A trial in the county court resulted in findings and judgment adverse to all the claimants. Several of the claimants appealed to the district court, where a trial was had in which the issue as to the relationship of the various parties to O'Connor was submitted to a jury. A verdict was rendered finding against each and every one of the claimants. From that judgment two sets of claimants have appealed, who will be hereinafter denominated as the Kirkman claimant and the Olsen claimants.

The first that is definitely known of O'Connor is in 1873, when he located in Fremont, Nebraska. He there worked as a cobbler for about two years. In 1875 he located in Hastings, Nebraska, and there operated a cobbler's shop for a number of years, and later opened, and for many years operated, a shoe store. He remained in Hastings from 1875 until his death in 1913. Where O'Connor was born, where he spent the years of childhood, youth and early manhood, who were his ancestors or other relatives, are all matters that are not definitely known and concerning which the evidence is in sharp conflict. Apparently, O'Connor was between 30 and 40 years of age when he located in Hastings, in 1875. During all of his residence in Fremont and in Hastings, he was known by the name of John O'Connor. During the 40 years of his life that he was fairly well known, he had with him at no time any person purporting to be a wife or child, or other relative; nor is it known that during all of those years he ever visited any one purporting to be a relative, or that any purported relative ever visited him. Neither does it appear that there was ever any correspondence during all those years between O'Connor and any other person as relative. At many times and to divers citizens of Hastings, with whom he was well acquainted and with whom he transacted business, he made the statement that, so far as he knew, he had no relatives on earth, or words of like import. When, on his deathbed, and within a day or two of his demise, he

was asked if he did not have some relative who could or should be notified, he responded: "Not a soul." Generally speaking, he seems to have been somewhat reticent concerning his early life. He was industrious, frugal, and thrifty, and succeeded in accumulating considerable property. From many things that appear in the record, he was always an honorable and upright man. During the 40 years of his known life, he is not shown to have committed a dishonorable act. In all of his business dealings he appears to have been just and kind and considerate to those with whom he dealt, and appears to have been rather fond of little children. Shortly after his death, numerous persons came forward and claimed relationship to O'Connor and the right to inherit his estate. From 18 states of the Union and from 3 foreign countries they came—about 150 in all. Two purported wills were brought forward by parties who sought to have them probated, and in which the proponents were named as beneficiaries, but both of these wills were adjudged to be forgeries. See *In re Estate of O'Connor*, 101 Neb. 617, and *In re Estate of O'Connor*, 105 Neb. 88.

From the judgment of the district court in the present proceeding, there are two appeals, one by John F. Kirkman, who avers that O'Connor's real name was James Madison Kirkman, and that claimant is his only child and heir at law; the other appeal, by Rudolph Olsen and the widow and children of John Olsen, deceased. These claimants allege that O'Connor's real name was Olaf Olsen; that Rudolph and John Olsen, now deceased, were the sons of O'Connor, the only heirs at law of O'Connor and entitled to inherit the latter's estate.

The Kirkman claimant contends that John O'Connor, alias James Madison Kirkman, was born in North Carolina and was the son of Harrison Kirkman; that about 1857, at the age of 17 or 18 years, young Kirkman left his home in North Carolina and went to Indiana and was there married to one Mary Trickey under the name of "Governor Kirkman"; that to this marriage a number of children were

born; that Kirkman deserted his wife and children and afterwards went under the name of O'Connor; that the wife of Kirkman and his children, other than claimant, are all deceased.

The Olsens contend that, in Manitoba, Canada, under the name of Olaf Olsen, O'Connor was married to Martha Johnston, a half-breed Indian woman; that O'Connor, alias Olsen, deserted his family in Canada about 1870; that Martha Johnston is dead, and that Rudolph Olsen and the widow and children of John Olsen, deceased, are the only surviving heirs at law of O'Connor, alias Olsen.

We will first consider the case as made by claimant Kirkman. He contends that he is entitled to a trial *de novo* in this court; that this court should examine the evidence and reach its findings of fact and conclusions independent of the findings of the jury or of the trial court.

The only provision of the law in this state requiring this court to retry the issues of fact involved in an action brought to this court by appeal upon the evidence preserved in a bill of exceptions, and for a trial *de novo* of such questions of fact, is contained in section 9150, Comp. St. 1922. That section, in so far as applicable, provides:

"In all appeals from the district court to the supreme court in suits in equity, wherein review of some or all of the findings of fact of the district court is asked by the appellant, it shall be the duty of the supreme court to retry the issue or issues of fact involved in the finding or findings of fact complained of upon the evidence preserved in the bill of exceptions, and, upon trial *de novo* of such question or questions of fact, reach an independent conclusion," etc.

Upon a reading of the statute, it will be observed that it is only in suits in equity that a trial of issues of fact *de novo* is required in this court, and unless the present action may be properly denominated a suit in equity, then claimant is not entitled to a trial of the issues of fact *de novo*. In the instant case, the questions presented by the pleadings in the county court for determination are purely questions of fact, as to whether John O'Connor was James Madison

Kirkman and the father of claimant John F. Kirkman, and whether O'Connor was related to any of the other claimants, as by them alleged. No equitable doctrine is invoked. No question is presented that calls for the exercise of equitable jurisdiction. The case does not fall within the provisions of the statute. The claimant is not entitled to a trial of the issues of fact *de novo* in this court.

Claimant further insists that the case was tried below upon the theory that the verdict of the jury was advisory only, and that it must be so tried in this court. The record discloses that claimant Kirkman made the same claim in the district court, and that the trial court adopted the findings of fact made by the jury as its own. Evidently, this was only a precautionary measure taken by the trial court. We deem it unimportant, however, whether the verdict of the jury was advisory or not, since the trial court adopted as its own the findings of the jury. Had the case been tried to the court, without the intervention of a jury, its findings of fact would have been entitled to the same force and effect as the verdict of the jury, upon a question of fact properly submitted to it.

Claimant Kirkman complains of the exclusion of certain testimony offered by two witnesses, daughters of one Mary Hickey. It is conceded that the evidence offered is hearsay, but claimant insists that it comes within one of the recognized exceptions to the rule excluding hearsay testimony. We are of the view that it does not fall within any exception to the rule and was properly excluded, but, in any event, its exclusion was not prejudicial, because it was but cumulative of other uncontroverted testimony admitted, upon the same question.

Kirkman also alleges error in the exclusion of certain testimony offered by the witness Rowe, and in excluding certain exhibits identified by him; also in the exclusion of certain letters passing between John F. Kirkman and the witness Hambly. We have examined the evidence and the rulings thereon and each of the exhibits. In our view, none of the evidence excluded was material or relevant to

any issue of the case. It tended neither to prove nor disprove any fact in issue, and we perceive no error in the rulings complained of.

Kirkman asserts error in the court's instruction, wherein the jury were permitted to determine whether O'Connor died without heirs. We are unable to perceive that this instruction was prejudicial to the claimant, since the jury found specifically, from all of the evidence, that claimant was not related to O'Connor. If claimant was not related to O'Connor, he had no right in the property, and whether it should escheat to the state was a matter of no concern to him.

Complaint is made of the refusal to give two instructions requested by claimant. We have examined the instructions and find that one of them is covered substantially by the instructions given by the court, and that there was no error in refusing to give either of the instructions requested.

Kirkman contends with a great deal of vigor that the verdict is not supported by the evidence, and that the latter requires a finding in his favor. We have carefully examined and read all of the evidence contained in the very voluminous bill of exceptions. We shall not attempt to outline all of the evidence, or review it, in this opinion, because to do so would make an opinion that would fill the greater part of a volume of our reports, and would serve no useful purpose; but we shall summarize some of the facts disclosed.

From the record it appears that for many years prior to 1914 Kirkman had lived in either Omaha or Council Bluffs, and had gone by the name of "Kertman," and that he presumed that to be his real name. According to his testimony, he knew from the family history that his father deserted his wife and children some time about 1869. When claimant read the newspaper accounts of the various persons claiming heirship to O'Connor, he thought that O'Connor might be his father. He went to Hastings to make some investigations as to the facts, and obtained photographs

which he was informed and believed to be those of O'Connor taken many years prior to his death. With these pictures, or copies thereof, he went to his former home in Indiana, and discovered from the records, as he claims, that his father's name was Kirkman; that he was married to Mary Trickey under the name of "Governor Kirkman." He produced evidence tending to show that James Madison Kirkman was born near Greensboro, North Carolina, and resided there with his father until about 1857, when he was 17 or 18 years of age; that when he left North Carolina he went to Indiana, where he was joined in marriage to Mary Trickey; that to this marriage a number of children were born; that his mother, Mary Kirkman, and all of the issue of her marriage to Kirkman, save himself, are dead. He presented the pictures that he had obtained of various old-time residents of Indiana, Ohio, Illinois, and North Carolina, and took about 20 depositions of persons, who identified the photographs as pictures of James Madison Kirkman, alias John O'Connor. Copies of these photographs were published in a newspaper, and it developed that the pictures, instead of being those of O'Connor, proved to be the photographs of a man by the name of Cornelius Culavin, who was then living in Indiana. Mr. Culavin was produced at the trial and identified the pictures as being of himself. The fact that Culavin had identified the photographs as his own became known to Kirkman long prior to the present trial. Not daunted by this fact, Kirkman produced other witnesses, who came and viewed the corpse of O'Connor and testified that it was that of the person whom they had known 50 years before as James Madison Kirkman. Other depositions were taken in which witnesses identified photographs of the corpse of O'Connor as being the photographs of James Madison Kirkman.

There was evidence tending to show that the upper part of the right ear of O'Connor was missing, but it was not apparent to the casual observer, and, from the photographs of the corpse which were in evidence, it is scarcely observable, even when attention is called thereto. Kirkman

produced evidence that James Madison Kirkman had the rim of his right ear frozen while living in North Carolina. The rigors of a winter in North Carolina, prior to 1857, may have been severe enough to freeze Kirkman's ear to such an extent that a part of it would come off. It is probable that the testimony of witnesses, who claimed to recollect such a very trivial defect in Kirkman's personal appearance after the lapse of so many years, did not greatly impress the jury.

There was evidence that James Madison Kirkman possessed an unusually long thumb and long fingers, and that his right thumb was particularly long; also that there was a scar on his left foot; and evidence was produced tending to show that O'Connor also had a particularly long right thumb and fingers and possessed a scar on his left foot. From an examination of the photographs of O'Connor's hands which are in the record, it appears that the thumb on his right hand was slightly longer than on the hand of an ordinary individual. The evidence of the witnesses produced by Kirkman relative to these characteristics was so startling and the witnesses gave in such detail and remembered so accurately the things which happened a half-century or more ago—things that would be trivial in their nature—that it would be a tax on the credulity of any intelligent person to believe that they could so remember.

Kirkman, himself, testified that he never remembered seeing his father except once; that when he was about five years old his father came home after a long absence, and remained at home on that occasion from 24 to 36 hours; that he invited the claimant, then not quite five years old, to go with him down-town. They visited a saloon. He remembered his father and another man standing at the bar and conversing; remembered that his father's name was Kirkman, and that the barkeeper's name was Kirk, and gave their conversation, indicating a most startling and phenomenal memory on the part of Mr. Kirkman, and yet he did not know that his own name was Kirkman, and did

not find it out until 1914 or 1915. Moreover, he produced a number of persons who claimed to be his relatives, and who testified that they had known claimant Kirkman from the time he was four years old, down to the present time, and that they knew that his name was Kirkman, but did not, apparently, know that he was going under the name of "Kertman."

Kirkman also produced evidence tending to show that James Madison Kirkman, when he deserted his family in Indiana, had taken with him a silk dress, belonging to his wife, and two large pictures in oval wooden frames, 11 or 12 inches across; that one of these frames contained the picture of Mary Trickey before marriage, and the other a photograph of Mary Trickey Kirkman, with her son, John F. Kirkman, in arms. These pictures were found in Fremont, Nebraska, where, it was alleged, O'Connor had, in 1875, left them with a man by the name of Hickey, who was to keep them until called for by O'Connor. This fact, if true, would be an indication that O'Connor and James Madison Kirkman were one and the same person. In the back of one of these oval frames was a purported photograph of one Bishop Edwards, who was a brother-in-law of James Madison Kirkman. In the back of the other frame was a photograph of a bridge. Kirkman's evidence tended to show that Harrison Kirkman, father of James Madison Kirkman, was a bridge builder in North Carolina, and that the picture was a photograph of a bridge built by Harrison Kirkman over a stream, known as Reedy Fork. The evidence further tended to show that after James Madison Kirkman left his home in North Carolina, in 1857, he never returned, and none of his family ever heard from him thereafter except once in Indiana. It developed that the bridge, claimed to be represented in the photograph, was not built until in the late sixties. It is something of a mystery how the picture could have come into the possession of James Madison Kirkman in Indiana. In addition to this, the bridge picture indicates that it is over a large stream and is about 600 feet long, while evidence taken in behalf of

the state shows that Reedy Fork, at the place where the bridge is built, is an insignificant and small stream. True, it may have dwindled from a stream 600 feet wide, in 1857, to one 20 or 30 feet wide, in 1923. Moreover, other evidence was produced on the part of the state, given by old-time residents of Fremont, Nebraska, that, in their opinion, the photograph was that of a bridge over the Platte river, near Fremont, in the early days.

Suffice it to say, in summing up the evidence on behalf of Kirkman, that he has undoubtedly established that there was such a person as James Madison Kirkman, and that he has apparently established that Mary Trickey and Governor Kirkman were married, and that perhaps the claimant Kirkman, alias John Kertman, is their son, but the evidence that John O'Connor of Hastings and James Madison Kirkman, or Governor Kirkman, were one and the same individual is far from satisfactory. It may be also noted, in this connection, that other claimants testified that the photographs, claimed to be those of Mary Trickey and of Mary Trickey Kirkman, with her son, were photographs of a totally different person.

After an examination and consideration of all the evidence, we arrive at the same conclusion, as did the county court, the jury and the trial judge in the district court, that Kirkman has not established any relationship to John O'Connor.

We will next consider the contention of the Olsen claimants. Twenty-five errors are assigned in their brief, which may be grouped under the following headings: Error in the admission of certain evidence; error in the giving and refusing of instructions; and that the verdict is not sustained by sufficient evidence. Of all these assignments only two are discussed in the brief, the first being error in receiving certain evidence.

The Allman claimants, who were defeated in the district court and did not appeal to this court, offered the testimony of John T. Culavin, given at a former trial, and then offered certain evidence tending to contradict the testimony

given by Culavin. We have examined the record and find that the only evidence offered to contradict the testimony of Culavin, and to which objection was interposed by the Olsen claimants, was excluded upon their objection. At least, this is true so far as anything pointed out by the Olsen claimants is concerned. Consequently, this assignment is without merit.

We will next consider the assignment that the verdict against the Olsen claimants is not supported by sufficient evidence. We will not undertake to review in this opinion all the evidence offered on behalf of these claimants but call attention to some of its salient features. They assert that, under the name of Olaf Olsen, John O'Connor was married to Martha Johnston, a half-breed Indian woman, in Manitoba, Canada, and that to this union a number of children were born; that Martha Johnston is dead, and that John and Rudolph Olsen were the only surviving children; that John Olsen is now deceased, and that his widow and children, together with Rudolph Olsen, are the only next of kin and are entitled to inherit the O'Connor estate.

Evidence was offered tending to show that after Olaf Olsen, or Olaf Wilson, was married to Martha Johnston, Olsen got into some trouble in Manitoba; that he was mixed up in the Riel Rebellion; that he killed two English officers, and perhaps committed other crimes, and left Canada about 1871; that on one occasion, a few years later, he went back home and saw his wife and children, and asked her to go with him, but she refused because she was then living with another man; that he then departed from Canada and never again returned.

John T. Culavin, who has heretofore figured as a claimant for the estate of John O'Connor, and who presented for probate a will, purporting to have been executed by O'Connor, in which Culavin was named as devisee and legatee, testified that, at the request of O'Connor, he went to Canada, to the neighborhood where O'Connor had formerly lived, and looked up O'Connor's relatives, and told them that O'Connor was dead. It is also significant that

Culavin and his attorney at the same time procured a power of attorney from John and Rudolph Olsen, and also a contract from them whereby Culavin and his lawyer would get the entire estate of O'Connor for a consideration of $2,000, of which only $200 was paid, provided that the Olsens succeeded in establishing their claim to the estate of O'Connor. Culavin, with his attorney, seems to have been quite active in attempting to graft O'Connor on the Olsen family tree for reasons which are apparent. Numerous witnesses from Canada, who had not seen Olsen for a half-century, were brought to Hastings to view the remains of John O'Connor, and gave it as their opinion that he was Olaf Olsen. Others identified the pictures of the corpse of O'Connor as being a picture of Olaf Olsen, but the evidence on behalf of the Olsens, given by a number of witnesses, was to the effect that Olaf Olsen had light hair and a light complexion; that he was a Swede, Dane, or Norwegian; that he spoke the Norwegian or Swedish language; that he was known as a Swede, such as his name would indicate; while the fact is established beyond question that O'Connor had very dark brown hair, dark brown mustache, and hazel eyes. His physiognomy, judging from the pictures of the corpse, does not indicate Scandinavian origin. His physiognomy and general appearance, as disclosed by the evidence, show almost unmistakably that John O'Connor was of Irish descent. There were many other discrepancies in the testimony on behalf of the Olsen claimants that would tend to cast doubt and suspicion on their claim as sons of O'Connor. Suffice it to say, that the jury's verdict, that John and Rudolph were not the sons of nor related to John O'Connor, seems to be fully sustained by the evidence.

It is contended further by both sets of claimants that the state of Nebraska had no right to intervene in this proceeding, and that it was prejudicial to the interest of the respective claimants for the state to offer evidence. With this contention we cannot agree. The object of the claimants was to establish their relationship to O'Connor, and

In re Estate of O'Connor.

to thereby inherit his estate. Under the law of this state, if O'Connor had no heirs to inherit, then his property would escheat and belong to the state. The state was interested, therefore, in seeing that no spurious claimant should be permitted to establish his claim. The state claimed an interest in the estate because it asserted that John O'Connor died without heirs, and it had a right to succeed to his estate, and was therefore interested in preventing any others from succeeding to the O'Connor estate, unless they were lawfully entitled so to do.

It has been held that escheat proceedings for defect of heirs cannot be prosecuted pending an administration of the estate; that the state's proper course is to intervene in the probate proceedings, setting forth its claim to the estate of the decedent. See 21 C. J. 855, sec. 15, and authorities there cited.

Other claimants than those who are parties to this action have appeared as friends of the court and filed a brief in this case, and requested that no order or judgment be entered in this cause that will bar them of their right to be heard; that they may be given an opportunity to establish their claims to heirship to the John O'Connor estate.

The judgment entered in the district court went no farther than to disallow the claims of all who are parties to this action, claiming as heirs of John O'Connor. According to the record, no judgment of escheat was entered in the county court, nor was one entered in the district court. The state did not appeal, and the question, whether judgment of escheat should be entered in this case, is not properly before us. The county court has exclusive original jurisdiction to determine heirship and to that court all claimants must go before they can be heard in this court upon that question.

The record presents no error that is prejudicial to the complaining parties, and the judgment of the district court is therefore

AFFIRMED.

Note—See Descent and Distribution, 18 C. J. 123.