IN RE ESTATE OF JOHN O'CONNOR.
ELIZABETH O'CONNOR BURGOYNE ET AL., CLAIMANTS,
APPELLANTS: CHARLES M. O'CONNOR ET AL., CLAIM-
ANTS, APPELLEES, V. STATE OF NEBRASKA,
INTERVENER, APPELLEE.
CHARLES M. O'CONNOR ET AL., CLAIMANTS, APPELLANTS, V.
STATE OF NEBRASKA, INTERVENER, APPELLEE.
ANNA BEEBE ET AL., CLAIMANTS, APPELLANTS, V. JOHN
SLAKER, ADMINISTRATOR DE BONIS NON, ET AL.,
APPELLEES.
ANNA BEEBE ET AL., CLAIMANTS, APPELLANTS, V. JOHN
SLAKER, ADMINISTRATOR DE BONIS NON, ET AL.,
APPELLEES.

FILED NOVEMBER 23, 1928. Nos. 26457, 26462, 26464, 26731.

*D. B. Massie* and *Ambrose C. Epperson,* for appellants.

*Charles E. Bruckman, Richard Price, Allen G. Fisher* and *Charles A. Fisher,* for Charles M. O'Connor et al.

*Paul E. Boslaugh* and *John A. Lawler,* for the State.

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON and EBERLY, JJ., and REDICK, District Judge.

GOOD, J.

These actions involve the final settlement of, and determination of heirship to, the estate of John O'Connor, deceased, and originated in the county court of Adams county.

O'Connor departed this life August 17, 1913, intestate. So far as disclosed, he was never married and left surviving no parent or issue. His place of birth, age and wheth-

er he left surviving any relatives, who are entitled to inherit his estate, are matters in dispute.

O'Connor had lived in the city of Hastings for a period of about 40 years preceding his death. When he first located in that city he was a cobbler and for several years worked at his trade. Later he became a shoe merchant and about 1908 he retired from the mercantile business and devoted his time and attention to looking after his property interests. He lived frugally and invested his savings prudently. At the time of his death his property was valued at approximately $100,000. During his 40 years' residence in Hastings he was known generally as a bachelor and to be reticent concerning his past life and family history. It is not disclosed that during his residence in Hastings any relative, or person claiming to be a relative, ever visited him. Among his personal effects there was not found any picture or photograph of, or letter purporting to have been written by, any relative.

Soon after the death of O'Connor many persons, claiming the right to succeed to his estate, appeared. Some presented and sought the probate of instruments purporting to be wills executed by O'Connor. Others claimed to be relatives and entitled to inherit his property, if it should be determined that he died intestate. Many of these claims have been heretofore litigated and finally determined adversely to the proponents of purported wills and to those claiming the right to inherit as next of kin. A number of these cases have been brought to and determined by this court. The following reported decisions relate to these matters: *In re Estate of O'Connor*, 101 Neb. 617; *In re Estate of O'Connor*, 105 Neb. 88; *In re Estate of O'Connor*, 114 Neb. 266.

In the present proceedings in the county court there were 12 distinct groups of persons, each group claiming to be relatives of O'Connor and to have the exclusive right to inherit his property. The state of Nebraska intervened as to each of the claimants, alleging that O'Connor had died intestate, without widow or kindred to inherit his

property, and claiming title thereto by escheat. A trial in the county court resulted in a finding in favor of the state and against each group of claimants. Three of these groups appealed from the judgment of the county court to the district court, and the state appeared in that court as intervener, as against the appealing claimants. The several appeals were consolidated and tried as one action to the court and a jury. The verdict was against each group of claimants and for the state, finding that O'Connor had died without leaving a widow or any kindred. Judgment was entered on the verdict. Each group of claimants has perfected a separate appeal to this court, where, for the purposes of argument, the appeals were consolidated and heard at one time. For convenience, the several groups of claimants will be designated and hereinafter referred to as the Burgoyne claimants, the O'Connor claimants, and the Beebe claimants.

After the trial in the district court and at a subsequent term of court, the Beebe claimants filed a second motion for a new trial, based upon the ground of newly discovered evidence. This motion was by the district court overruled, and the Beebe claimants have perfected a second appeal to this court, to review the ruling of the court on the motion for a new trial.

The Burgoyne claimants assert that they are nieces of O'Connor, being daughters of his deceased sister Margaret. They aver that their mother was one of four children, the other three of whom were brothers named John, James E., and Michael; that James E. and Michael predeceased John O'Connor and left no surviving issue; that their grandparents came from County of Clare, Ireland, to St. Alphonse, in Quebec, Canada; that John O'Connor learned the cobbler's trade and left home about 1864, and apparently was not seen again nor heard from directly by any member of the family of these claimants until 1896, when, it is claimed, he visited his sister Margaret, in Washburn, Wisconsin.

The O'Connor claimants aver that they are children

of Michael O'Connor, deceased, and that Michael O'Connor was a brother of John O'Connor; that John and Michael and another brother came from Ireland to the state of Michigan about 1858, and that in 1859 or 1860 John O'Connor left Jackson, Michigan, and went west; that none of this group of claimants or their families ever again saw him in his lifetime.

The Beebe claimants assert that they are descendants of brothers of John O'Connor; that the latter was born in Ballyhoolie, county of Cork, Ireland; that John O'Connor was one of a family of four children; that he came from Ireland to Pennsylvania, from there removed to Ontario, Canada, later going to Dubuque, Iowa, and from there to Nebraska. Each of the several groups of claimants deny the relationship of either of the other groups to John O'Connor, and each group of claimants disclaim any relationship to either of the other groups.

There are numerous assignments of error, a number of which are common to each of the appeals. These will be considered first.

Each of the claimants alleges error in that the trial court permitted the state to intervene and resist the right of any claimant to the estate of John O'Connor. It seems to be the contention of the claimants that, as long as there is any person claiming to be an heir of O'Connor and whose right has not been judicially determined, the state has no right to intervene and has no interest in the estate.

Section 8552, Comp. St. 1922, confers on any person, who has or claims an interest in the matter in litigation in any pending action, the right to become a party to such action. Such intervener may join with either plaintiff or defendant to resist the claims of the other, or, if his interest so requires, he may resist the demands of both. The state was claiming that O'Connor died without leaving heirs or widow, and that it was entitled, under the law, to take the estate left by O'Connor. Each group of claimants were seeking to establish kinship to decedent, and if any of them could establish their claims they were entitled

to the estate. The real question, in its final analysis, was to determine who was entitled to the property of decedent. The state's claim was adverse to each of the other claimants, and it claimed an interest in the subject-matter of the litigation, namely, the property of John O'Connor, deceased.

The right of the state to intervene in such a proceeding is conferred by statute and has been heretofore established by the decisions of this court in the following cases: *In re Estate of Keller*, 101 Neb. 115; *In re Estate of O'Connor*, 114 Neb. 266. In the latter case it was held: "Where, in the county court in the probate of the estate of an intestate decedent, numerous persons file petitions, alleging that they are related to decedent, and there is reason to believe that the decedent died without heirs, it is proper for the state to intervene in the proceedings, and assert its right and prevent the establishment of a spurious claim as genuine." Among the decisions from other jurisdictions, holding to the same effect as those of our own court, are the following: *State v. Lancaster*, 119 Tenn. 638; *In re Estate of McClellan*, 31 S. Dak. 641; *State v. O'Day*, 41 Or. 495. We adhere to the rule adopted in our former cited opinion.

It is contended by each group of claimants that the court erred in entering a judgment for, and awarding the property of O'Connor to, the state. Prejudicial error cannot be predicated on a ruling or judgment of the trial court which does not affect the substantial rights of the complaining party. In the instant case, if the judgment against each group of claimants, adjudging that they are not heirs of O'Connor, is free from prejudicial error, the judgment for the state does not concern them nor affect any of their substantial rights. Whether prejudicial error has been committed in the verdict and judgment against any of the claimants will be determined in the course of this opinion.

Another contention made by two or more of the groups of claimants is that the presumption obtains that every deceased person left heirs, and that the burden is on the

state to prove the failure of kindred or surviving spouse, and it is insisted that this should be by proof of high degree. While the presumption obtains that the deceased person left surviving heirs, it does not follow that there is a presumption that any particular person or claimant is an heir. If such were the case, then, of more than 200 persons, who have appeared, claiming the O'Connor estate, there would be a presumption in favor of each one, although the various sets of claimants, more than a score in number, are unrelated to each other. This presumption would probably obtain as against the right of the state to a judgment of escheat, but, as heretofore pointed out, unless there was error in the trial, relating to one or more of the groups of claimants, wherein the jury found that they were not related to O'Connor, they are not in a position to raise any objection as to the verdict and judgment for the state, since, if they are not related to O'Connor and are not entitled to inherit his estate, they cannot be prejudiced by the judgment entered for the state.

During the trial evidence was offered by different groups of claimants, tending to show that the claimants bore a physical resemblance to O'Connor, and in most instances this evidence was excluded. In some instances it was admitted without objection, and in others it appears to have been admitted over objection. Complaint is made because the evidence was not admitted by those who offered it, and because it was admitted in some instances as to another group of claimants, when offered.

Two of the groups of claimants complain of rulings of the trial court in admitting evidence tending to prove that there existed between the deceased and some of the other groups of claimants a personal physical resemblance. Since the verdict was against the latter group, the error, if any, was harmless. Harmless error is not a ground for reversing a judgment.

Two of the groups allege error in the exclusion of evidence tending to prove a resemblance in personal appearance of some members of the respective groups to the de-

ceased. The position of some of the groups is inconsistent. They objected to such evidence when offered by other claimants, and in nearly every instance the objections were sustained, but complain when a like ruling is made against them. Under such circumstances, this court could properly decline to consider the alleged error. We prefer, however, to consider the question on its merits.

There is a contrariety of judicial opinion on admissibility of evidence of personal resemblance to prove consanguineous relationship. In England, the prevailing view is in favor of its admission. Formerly this view was, to some extent, followed in this country. The trend in later years has been either adverse to or for a modification of the English rule. So far as we are at present advised, this court has passed upon the question in filiation cases only, and has held that it is improper in such proceedings to exhibit the child to the jury for the purpose of showing its personal resemblance to the putative father, as tending to prove the relationship of parent and child.

In *Hutchinson v. State*, 19 Neb. 262, in an opinion by Reese, J., it was said: "A number of authorities are cited which hold that it is improper to introduce or present a child to a jury for the purpose of permitting the jury to draw conclusions as to its paternity from a supposed resemblance to the alleged father, unless by a difference in color or some other marked characteristic the resemblance or want thereof can be clearly shown."

In *Ingram v. State*, 24 Neb. 33, where counsel for the prosecution, in a filiation proceeding, directed the prosecutrix to turn the face of the illegitimate child so that the jury could observe it, an objection was made and sustained by the court, and the ruling apparently approved.

In *Esch v. Graue*, 72 Neb. 719, the following language from the opinion in *Hanawalt v. State*, 64 Wis. 84, was cited with apparent approval: "In bastardy proceedings the bastard child may not be exhibited to the jury for the purpose of showing by its likeness to the defendant that it is his child." And Barnes, J., in writing the opinion com-

mented as follows: "This rule seems to have been approved by us in *Ingram v. State,* 24 Neb. 33. In fact it is believed that the great weight of authority now holds that a child less than two years of age may not be exhibited to the jury for the purpose of showing its likeness to the defendant in a bastardy proceeding."

It is a well-known fact that there are distinct racial characteristics, especially as to the color of skin, hair and eyes. As a rule the North American Indian has black eyes, straight black hair, brown or copper-colored skin and prominent or high cheek bones. The African has black or dark skin, black eyes, hair kinky and black, and he usually has thick lips and a rather flat nose. Other races possess distinct characteristics. To a somewhat lesser degree there are distinctive personal characteristics in people of the same nativity. Usually, the Norwegian and Swede have light complexion, light-colored hair and eyes, while the people of Southern Italy, Spain and Mexico are usually swarthy, with dark hair and eyes. It, is also a well-known fact that frequently peculiar and distinctive physical characteristics do exist in members of the same family, and that particular traits and physical characteristics may be transmitted from parent to child. On the other hand, it is a well-known fact that members of the same family may be entirely different from each other and have, apparently, no points of resemblance in personal appearance. Also, it is well known that very strong personal resemblances frequently exist between persons who are wholly unrelated. The fact that particular traits and marked physical characteristics are shown to exist between two individuals may be of slight worth in determining whether they are related by consanguinity; yet such fact, where it exists, is a circumstance that may be considered, with other evidence, in determining the question of relationship.

The decisions, in bastardy proceedings, holding that the resemblance between child and the putative father is not admissible, are grounded upon good reason. It is a well-known fact that a child of very tender years, ordinarily,

has no decidedly marked features, and that the family characteristics, if any, are not developed in early infancy. We think the proper rule to be deduced is that evidence of general resemblance of one individual to another should not be admitted for the purpose of establishing a relationship by consanguinity, but, where specific traits and particular or peculiarly marked physical characteristics are shown to exist, that evidence thereof should be received and the weight of such evidence left to the jury.

Applying this rule to the facts in the instant case, as disclosed by the record, we find that most of the excluded evidence was that of a general resemblance and was, therefore, properly excluded. Other evidence offered along this line did not disclose that the person testifying had a personal knowledge of either the peculiar traits or marked physical characteristics of the deceased, or of the member of claimants' family to whom it was sought to establish a resemblance. We find no prejudicial error committed by the trial court in the exclusion of such evidence.

Two groups of claimants assert that there was error in permitting counsel for the state to close the arguments to the jury. The Burgoyne claimants, particularly, contend that, since they were directed to first introduce evidence and to open the arguments to the jury, their counsel should have been permitted to make the closing argument.

It is a general rule in the trial of an action that the party against whom judgment would go if no evidence were introduced is entitled to open and close the arguments to the jury. This rule, however, is not applicable to all classes of cases. In the instant case, each group of claimants would fail and judgment go against each group if no evidence were introduced. Likewise, if no evidence were introduced, no judgment could go in favor of the state. It is a situation where each of the four interested parties would lose if no evidence were introduced. It is impossible that each should have the opening and each have the close of the arguments to the jury. The general rule, therefore, is not applicable to the situation here presented.

In *Bays v. State,* 6 Neb. 167, where a matter of practice arose as to which there was no statutory provision applicable, this court said: "In the practice of the courts contingencies not infrequently arise which the legislature has not anticipated by any suitable provision. These must be met by some general or special rule of court suited to the exigency, and which shall protect suitors in all their legal rights." The language in the above case is quoted with approval in *Lindley v. State, ante* p. 597.

Where, in the trial of a case, a situation arises regarding the practice that should obtain, and where there is no statutory rule, or none has been enunciated by the court which is applicable, the matter rests in the sound discretion of the trial court, and no error may be predicated on its exercise of such discretion unless an abuse thereof is disclosed. In the instant case, the trial court directed the Burgoyne claimants to first introduce evidence, followed in turn by the O'Connor and Beebe claimants, and then the evidence for the state, and each group of claimants and the state, in turn, were permitted to offer rebuttal testimony. The trial court directed that arguments be made to the jury, first by the Burgoyne claimants, followed by the other claimants and the state in order, and permitted each group of claimants and the state, in the same order, to reply to the principal arguments made by the respective parties. This ruling of the court was fair and reasonable to all parties, and it does not appear to have been prejudicial to any. The rule of procedure adopted by the trial court meets with our approval.

Some of the claimants contend that the trial court should have heard the cases without the intervention of a jury; that it was error to submit the questions of fact to the jury, and that they are entitled to a trial *de novo* upon the issues in this court.

The only statutory provision, requiring a trial *de novo* on questions of fact in this court in cases brought here by appeal, is contained in section 9150, Comp. St. 1922. That section is as follows: "In all appeals from the district court

to the supreme court in suits in equity, wherein review of some or all of the findings of fact of the district court is asked by the appellant, it shall be the duty of the supreme court to retry the issue or issues of fact involved in the finding or findings of fact complained of upon the evidence preserved in the bill of exceptions, and upon trial *de novo* of such question or questions of fact, reach an independent conclusion." The same question was presented to this court in *In re Estate of O'Connor*, 114 Neb. 266, wherein it was held: "A proceeding begun in the county court, to determine whether petitioners are next of kin and heirs at law of a decedent, does not present a case calling for the exercise of equitable jurisdiction, and does not fall within the provisions of section 9150, Comp. St. 1922, requiring a trial of the issue of fact *de novo* in the supreme court."

In the case last cited the trial court adopted the findings of fact made by the jury and rendered judgment upon its findings as well as upon the verdict of the jury. This was evidently a precautionary measure taken by the trial court. We might rest this question without further discussion, but the question seems to be recurring from time to time in the trial courts as to whether, in actions of this character, the litigants are entitled to a trial by jury.

Formerly, civil actions were brought to this court by error proceedings, except in equity matters, where they would be brought by appeal. While that condition of the law existed, this court, by Norval, J., rendered an opinion in *Whalen v. Kitchen*, 61 Neb. 329, in which it was held that this court could not review, on appeal, decisions made by a county court in the settlement of the estate of a deceased person, and that such decision could only be reviewed in this court by error proceedings. This opinion recognized that the action was essentially and in all respects legal in its nature, as distinguished from equitable. The rule there announced was applied and followed in *Boales v. Ferguson*, 2 Neb. (Unof.) 172.

While the proceeding for the settlement of estates of deceased persons is statutory, in the absence of regulatory

statutory provisions, the trials in such matters must be governed by those applicable to the trial of civil cases at law, rather than in equity. It was observed by this court in *In re Estate of O'Connor*, 114 Neb. 266, in a like situation, that no equitable doctrine is invoked and the application of no principle of equity is required in the determination of the issues presented in cases of this character.

In proceedings to determine whether claimants are next of kin to a decedent and entitled to inherit his estate, only questions of fact are involved. In the recent case of *In re Estate of Buder, ante,* p. 52, a similar question was presented. In the course of the opinion this language may be found: "The only question for the county court to determine was, who were the legal heirs of Marie Buder. This question is purely legal; no equitable considerations affect it, and in the absence of the alleged contract would be perfectly simple." Since the proceeding is purely legal in its nature, the parties litigant were entitled, in the district court, to a jury trial.

The Burgoyne claimants assert error in that the jury returned a verdict in less than six hours and that it was a five-sixths verdict. In civil actions the statute permits a jury, after deliberating six hours, to return a verdict signed by five-sixths of their number. In the instant case, the record discloses that more than six hours elapsed after the submission of the cases and before a verdict was received, and it fails to disclose that the jury were not deliberating during this entire time. Error is not shown in this respect.

The Burgoyne claimants complain of the giving of instruction No. 4, in which the brother of Margaret O'Connor is referred to as of Washburn, implying that O'Connor, deceased, had at some time lived in Washburn, Wisconsin. A careful examination of the instruction shows that it was outlining to the jury who were the several groups of claimants, and the reference was, evidently, to the fact that Margaret O'Connor, mother of the Burgoyne claimants, had a brother, John O'Connor, and the question for

the jury to determine was whether the deceased was a brother of Margaret O'Connor of Washburn. The instruction is not subject to the criticism made, and it does not recite that O'Connor, deceased, ever resided in Washburn, Wisconsin, and, had it done so, it is difficult to see how it could have prejudiced any claimant. An instruction that is not prejudicial to the complaining party is no ground for reversal of the judgment.

The Burgoyne claimants further complain of the refusal to give two instructions, one of which would have directed a finding against the O'Connor claimants, and the other relating to the weight of expert testimony on handwriting. With respect to the refused instruction, it appears that the jury found against the O'Connor claimants. The refusal to give the instruction did not harm the Burgoyne claimants. The one relating to the weight to be given expert testimony seems to be a correct statement of the law, but the general instructions that were given by the court seem to be sufficient to cover every phase of the weight to be given to any testimony offered in the case, and no error is shown in the refusal to give the requested instruction.

The O'Connor claimants complain of the refusal to give a group of several instructions, and also complain of the giving of a group of several instructions. Under the rule well recognized in this court, such an assignment requires only an examination sufficient to show that any one of the group of instructions given was properly given, and that any one of the group refused was properly refused. An examination of the group given and the group refused shows clearly that most, if not all, of those given were properly given, and that at least a number of those refused were properly refused.

Each set of claimants complain that the verdict is not sustained by the evidence, and the Burgoyne claimants, in particular, contend that the evidence is sufficient to have required a verdict in their favor. We have carefully read the entire bill of exceptions, consisting of many hundreds of pages, and have carefully scrutinized every exhibit of-

fered, whether received or rejected, and, while the evidence in behalf of the Burgoyne claimants, standing alone, is quite strong, yet, when the cross-examination of their witnesses, the unreasonableness of the testimony given by some of them, and the contradictory evidence given by other witnesses are taken into consideration, the record simply presents a case where the evidence is in conflict. The weight and value of such evidence were for the jury to determine, and their verdict is conclusive on the questions of fact to them submitted.

At a term of court subsequent to that of the trial, the Beebe claimants filed a second motion for a new trial, based upon the ground of newly discovered evidence. This motion was by the district court overruled, and from the overruling thereof the Beebe claimants have prosecuted a second appeal.

In *Parkins v. Missouri P. R. Co.,* 79 Neb. 788, this court held: "A new trial will not be granted upon the ground of newly discovered evidence, where such evidence is merely cumulative and would not, in all probability, affect the result if a new trial were granted." The same rule was adhered to in *Kraus v. Clark,* 81 Neb. 575. The evidence which the Beebe claimants assert is newly discovered was only cumulative in its nature, and it does not appear that it was likely to have been of such import or weight as would have resulted in a different verdict, had a new trial been granted. Morever, O'Connor had been dead for more than a decade when the trial occurred, and no reason is shown why these claimants could not have obtained any evidence that they desired, if they had been diligent. We find no error in the overruling of the Beebe claimants' motion for a new trial.

There are numerous other assignments of error which we deem unnecessary to discuss, but we have considered and examined each and every one.

No error prejudicial to any group of claimants has been found. The judgment of the district court is therefore

AFFIRMED.